(C. D. 1307)

THE NATIONAL SUGAR REFINING COMPANY *v.* UNITED STATES

United States Customs Court, First Division

(Decided March 6, 1951)

*Altschuler & Morrison* (*Benj. M. Altschuler* of counsel) for the plaintiff.
*David N. Edelstein*, Assistant Attorney General (*Richard E. FitzGibbon*, special attorney), for the defendant.

Before OLIVER, COLE, and MOLLISON, Judges

MOLLISON, Judge: The plaintiff company imported certain raw sugar which it refined and caused to be laden on board the S. S. *Jessmore* for exportation with benefit of drawback under the provisions of section 313 of the Tariff Act of 1930 (19 U. S. C. §1313). The amount of the shipment was 2,241,200 pounds, and the vessel sailed from the port of New York on October 18, 1947, destined for St. John's, Newfoundland. On the following day, while the vessel was at sea, she was in a collision with another vessel which caused such damage to the *Jessmore* that she returned to New York.

Of the shipment of sugar in question, 990,236 pounds remained intact and was subsequently exported to St. John's, Newfoundland, and drawback thereon was paid to the plaintiff. 1,038,756 pounds were presumably lost at sea as a result of the collision, and drawback thereon was paid to the plaintiff. 212,208 pounds were relanded in damaged condition after the vessel returned to New York and were subsequently sold by a surveyor for the benefit of the insurers. It should be noted that upon its return to New York the sugar was treated as a nonimportation and no duties were charged upon it.

The plaintiff company did not own the damaged sugar when it was returned and relanded, nor did it have anything to do with, or any interest in, the return, relanding, and subsequent sale.. Drawback on the said 212,208 pounds of sugar so returned and relanded was denied by the collector of customs on the ground that the same had not been exported as required by section 313 (a) of the tariff act.

In the protests presently before us, the plaintiff claims that the damaged and relanded sugar should have been treated as an exportation and a reimportation under paragraph 1615 of the Tariff Act of 1930, as amended, rather than as a nonexportation and nonimportation. For convenience, the pertinent portions of section 313 (a) and paragraph 1615, as amended by the Customs Administrative Act of 1938, are set forth in the margin.[1]

It is the plaintiff's position that there had been a *bona fide* exportation of the sugar in question and that the conditions of the drawback statute had therefore been fulfilled, thus entitling the plaintiff to drawback. It is the defendant's position that there had been no exportation in view of the fact that the merchandise was returned to the United States, unladen from the ship, and sold into the commerce of this country.

Citing the leading case of *Swan & Finch Co.* v. *United States*, 190 U. S. 143, 47 Law. ed. 984, the plaintiff contends that to constitute an exportation within the meaning of section 313 (a), *supra*, two essential elements are required: (1) A severance of goods from the mass of things belonging to this country, i. e., a carrying of the goods out of the country, and (2) an intention of uniting them with the mass of things belonging to some foreign country. It is argued that the facts in this case establish the existence of these two elements.

---

[1] SEC. 313. DRAWBACK AND REFUNDS.

(a) ARTICLES MADE FROM IMPORTED MERCHANDISE.—Upon the exportation of articles manufactured or produced in the United States with the use of imported merchandise, the full amount of the duties paid upon the merchandise so used shall be refunded as drawback, less 1 per centum of such duties * * *.

PAR. 1615 [Free List]. (a) Articles, the growth, produce, or manufacture of the United States, when returned after having been exported, without having been advanced in value or improved in condition by any process of manufacture or other means. [Free.]

* * * * * * *

(e) The foregoing provisions of this paragraph shall not apply to—

(1) Any article upon which an allowance of drawback has been made under section 313 of this Act or a corresponding provision of a prior tariff Act, unless such article is in use at the time of importation as the usual container or covering of merchandise not subject to an ad valorem rate of duty.

* * * * * * *

(f) Upon the entry for consumption or withdrawal from warehouse for consumption of any article previously exported, which is excepted from free entry under this paragraph by the foregoing subparagraph (e) and is not otherwise exempted from the payment of duty, there shall be levied, collected, and paid thereon, in lieu of any other duty or tax, a duty equal to the total duty and internal-revenue tax, if any, then imposed with respect to the importation of like articles not previously exported from the United States, but in no case in excess of the sum of customs drawback, if any, proved to have been allowed upon the exportation of such article from the United States plus the amount of the internal-revenue tax, if any, imposed at the time such article is entered for consumption or withdrawn from warehouse for consumption upon the importation of like articles not previously exported from the United States.. * * *

The defendant apparently agrees that both a carrying out of goods and the intent to unite them with the goods of a foreign country are essential elements of exportation, but argues that something further, either actual landing of the goods in a foreign country or at least the retention of the goods outside of the United States, i. e., that they shall not be returned, is also an element.

Counsel for neither party has cited, nor have we been able to find, a decided case precisely in point. The *Swan & Finch Co.* case, *supra*, involved the status with respect to drawback of goods placed on board a vessel bound for a foreign port to be used and consumed on board the vessel during its voyage, and in fact so used and consumed. It was there held by a majority of the court that such goods had not been exported within the meaning of the drawback statute as it then existed for the reason, among others, that—

\* \* \* Another country or State as the intended destination of the goods is essential to the idea of exportation.

It is to be noted that in that case the court did not pass upon the question of whether actual landing in a foreign country or at least nonreturn to the United States was an essential element of exportation since that question was not involved. The same is true in each of the other cases cited by the plaintiff on the point, to wit, *Van Camp Sea Food Co. (Inc.)* v. *United States*, 56 Treas. Dec. 415, T. D. 43661, and *McKesson & Robbins, Inc.* v. *United States*, 68 Treas. Dec. 1130, Abstract 32500. The issue in each of those cases revolved around the question of the intention of the shipper in causing goods to be carried out of the country, but none of them can be accepted as authoritatively establishing that the carriage of goods out of the country with the intention of uniting them to the mass of things belonging to some foreign country are the *only* essential elements involved in exportation as contemplated by the drawback provisions.

The case which probably comes closest on its facts to the situation in the case at bar is that of *Lloyd's Subagent* v. *United States*, 19 C. C. P. A. 408, T. D. 45576. There, certain welded steel casings of American manufacture were shipped from the port of New York, without drawback, on a vessel bound for Venezuela, which was the intended destination of the goods. The vessel was wrecked by a storm near the coast of Santo Domingo and subsequently the cargo was salvaged and sent back to the United States where it was entered by the salvors. Duty was assessed thereon by the collector under the provision for welded steel pipe in paragraph 328 of the Tariff Act of 1922, and timely protest was filed claiming the same entitled to free entry as American goods returned under paragraph 1514 of the said act, or at lower rates of duty under various other provisions of the said act.

No claim was included in the protest that the merchandise had never been exported and consequently could not have been imported; on the contrary, each of the protest claims was founded upon the premise that the return of the goods to the United States constituted an importation. The concession of counsel for the importer "that, under the authorities, the goods were never exported, and hence could not be reimported" was accepted by the court as conclusive of the claim under paragraph 1514, *supra*, without attempting to decide that question, and it was held that inasmuch as the protest contained no claim for free entry on the ground of nonimportation no relief could be afforded the importer.

Another case having a similarity of facts to those in the case at bar is *Saxon* v. *United States*, 2 Treas. Dec. 199, T. D. 21476. In that case certain goods were shipped from the port of New Orleans on board a vessel ostensibly bound for Jamaica but which instead touched at the port of Santiago, Cuba, then in the hands of the United States military authorities, where it was sought to land the goods. Permission to unlade was denied, and the goods were thereupon returned to the port of New Orleans, where they were assessed with duty on the ground that they constituted imported merchandise covered by the dutiable schedule of the tariff act then in force.

On the trial of the issue it was contended that as the goods were never actually landed abroad at any foreign port they were not exported, and hence could not be considered as imported. After first holding, following *Fleming* v. *Page*, 9 How. 603, that for tariff purposes Santiago, although occupied by United States military forces, remained a foreign port so that the merchandise could be considered as exported therefrom by reason of the vessel sailing from that port, the late Judge Somerville of this court said:

If, moreover, it be admitted that the merchandise was not *exported* in any proper sense from Santiago, but was simply exported from New Orleans, and, after removal beyond the jurisdiction of the United States Government, was reimported in the same vessel, the conclusion must still be reached that the goods are liable to duty. This point was expressly settled by the circuit court of the United States for the district of Maine, in an opinion by Mr. Justice Clifford, in the case of McGlinchy v. United States (4 Cliff., 312, s. c. 16 Fed. Cases, 118). The merchandise there involved was a number of barrels of whisky, which had been loaded upon the carrying vessel at Boston and exported from that port for St. Pierre, Miquelon, which is a foreign port. The whisky was brought back in the same vessel and landed at a point in Casco Bay, in the State of Maine. The contention was made that the merchandise was not shown to have been landed at any foreign port or place, and that its relanding in the United States did not constitute an "importation" within the meaning of the tariff act. It was, however, held by the court that to constitute a reimportation it was not necessary to show that the whisky had ever been transported to nor unladen in a foreign port or place, and it was accordingly held liable to duty. * * *

In the opinion of the Solicitor General of the United States, afterwards approved by the Attorney General, found in 17 Op. Attys.

Gen. 579, the shipment of whisky from the United States to Bermuda with the purpose, after landing it there, of transporting it back to this country and entering the same as an importation, was considered not to be an exportation within the meaning of the customs and revenue laws as there was no intention of uniting the whisky with the mass of things belonging to Bermuda.

We believe that this opinion, which was cited with approval by the majority of the court in the *Swan & Finch Co.* case, *supra*, and which primarily deals with the aspect of intention as involved in exportation, contains nevertheless a valuable discussion as to the necessity of the completeness of the act of exportation for customs purposes. At page 583, the Solicitor General observed:

As the legal notion of emigration is a going abroad with an intention of not returning, so that of exportation is a severance of goods from the mass of things belonging to this country with an intention of uniting them to the mass of things belonging to some foreign country or other. All emigration as above defined is attended with a chance that the intention may afterwards (*i. e.*, after actual removal) be changed. *This chance does not affect the character of the act.* Nor does the circumstance of an original speculation that such chance may occur, or even a resolution that upon a certain contemplated contingency the party about to emigrate will return—*e. g.*, upon a change of government or upon the loss of his health—affect the validity of an emigration otherwise bona fide. I suppose that the case may often be the same with exportations as above defined, viz, a contingent change in the state of the market, by which it may be profitable to bring them back, the *immediate* bona fide purpose as well as act, however, being to seek a foreign market. This would nevertheless be an *exportation*, and upon return of course an *importation*. Nor would such exportation be *defeated* by the incident of "preserving the identity" of the goods. [Italics in sentence added; other italics quoted.]

The view that goods are exported when the physical carriage out of the country with the intention of uniting them with the goods of a foreign country has taken place, and that it is not necessary for the completion of the act of exportation that the intention actually be carried out, finds support in a consideration of the well-established understanding in customs law as to when goods are imported so as to make them subject to the application of tariff laws. In *Kidd* v. *Flagler*, 54 Fed. Rep. 367, at page 369, it was said:

The term ["export"] is the direct converse of "import" * * *,

and in the opinion of the Circuit Court of Appeals of the Second Circuit, reversing the decision in the foregoing case on other grounds (*Flagler* v. *Kidd*, 78 Fed. Rep. 341, at page 344), the court said:

Ordinarily, goods are exported when they are carried out of the country for the purpose of being transferred to a foreign situs. * * * Conversely, goods are imported when they are brought within the country with intent to land them here. *The intent characterizes the act, and determines its legal complexion.* U. S. v. Vowell, 5 Cranch, 368; The Mary, 1 Gall. 206, Fed. Cas. No. 9,183; The Boston, 1 Gall. 239, Fed. Cas. No. 1,670. * * * [Italics added.]

We are of the opinion that both logic and the weight of authority indicate that goods may be said to be exported, at least so far as the drawback statute is concerned, when physical carriage out of the country with the intention to unite them with the goods of a foreign country has taken place, so that subsequent events which may cause a return to this country before the intention is carried out do not affect the character of the act as an exportation.

It is contended by counsel for the defendant that the return of the sugar in the case at bar cannot be considered an importation so as to make it dutiable under the provisions of the Tariff Act of 1930 by reason of the provisions of Title 1, Section 1 of the act, which provide for the imposition of duties upon articles "imported from any foreign country." We observe that the status of the sugar on its return is not directly involved in the action before us, but we deem it not impertinent to note that the provisions of paragraph 1615 (e) (1) and (f) of the tariff act were obviously designed to be applicable in such a situation.

The claim in each of the protests that the sugar in question should have been treated as an exportation under the drawback provisions of the tariff act is sustained, and judgment will issue directing the collector of customs to reliquidate the entries allowing drawback thereon accordingly.