**UNITED STATES of America,**
**Plaintiff,**

**v.**

**ONE REEL OF 35MM COLOR MOTION PICTURE FILM ENTITLED "SINDER-ELLA" SHERPIX, INC., Claimant.**

**No. 72–C–804.**

United States District Court,
E. D. New York.

Dec. 29, 1972.

O'Brien, Raftery, Rosenbloom & Grainger, New York City by Edmund C. Grainger, Jr., New York City, for claimant.

Robert A. Morse, U. S. Atty., Brooklyn, N. Y. by Carl L. Stewart, Asst. U. S. Atty., for plaintiff.

## MEMORANDUM OF DECISION

MISHLER, Chief Judge.

Sherpix, Inc., the claimant in this proceeding, imported a cartoon film titled "Sinderella." It arrived at John F. Kennedy International Airport on May 27, 1972. The film was offered for entry on May 31, 1972 by claimant's customs broker. It was seized by customs agents on June 6, 1972 after viewing the filming as obscene under the authority of section 305 of the Tariff Act (19 U.S.C. § 1305). The government instituted this proceeding by filing a complaint in the office of the Clerk of this court on June 16, 1972.

The sole issue on the merits of the claim is whether the film is obscene.

The government's case was a showing of the film. The claimant offered the opinion of three experts and the testimony of Louis Sher, president of the claimant corporation.

"Sinderella" is an animated cartoon with accompanying sound. The running time of the film is about 6½ minutes. The general outline of the plot is the story of Cinderella interspersed with bits and parts of Little Red Riding Hood, Puss N' Boots and Goldilocks and The Three Bears. While the narrator recites the script with the tonal wonderment of a fairy tale free from vulgarity, the film depicts sexual organs and sexual acts. The first scene shows Sinderella in the woods; she finds something on the ground which upon her urging becomes an erect phallus, she then inserts it between her legs in masturbation. Other scenes depict Sinderella performing sexual acts with the above-mentioned fairy-tale characters as well as with the prince in a bedroom of the palace and shadowy outlines indicating The Three Bears having sexual relations with Sinderella in rapid succession. There is hardly a frame of the film that does not show genital organs, the sexual act, or movement from which sexual activity is suggested.

Professor Charles Winick, a professor of sociology and a licensed psychologist, conducted a consumer study of viewers of sexually explicit materials authorized by the President's Commission on Obscenity and Pornography. He interviewed 5,000 consumers in that study and wrote on changing attitudes toward sexual behavior of the American public since 1945. He made a study for the National Association of Broadcasters to develop a method for quantifying the contents of cartoons. He testified that cartoons almost always tend to be humorous and their visual stimuli of movement and action and wit interest all age groups. Professor Winick found redeeming social value in the wit and humor of the film. He found that combining aspects of the four fairy tales ". . . in the cartoon format of a modern version of these several elements of folklore and fairy tales" was witty and clever. In his opinion the film is not likely to stimulate sexual fantasies because viewers do not identify with the semi-abstract shapes and figures of a cartoon.

Professor Frank Hoffman is a professor of English at the State University College in Buffalo and is in charge of a program in folk-lore and motion pictures. He found that the film followed ". . . the outline of the traditional story of Cinderella developed in a humorous, witty, satirical manner with an orientation towards sex." He states that portrayal of an erect phallus and sexual acts "adds humor, satire, wit to the tale." Professor Hoffman opined that the film's depiction of sexual acts does not offend contemporary national community standards.

Professor Richard Brown is a professor at New York University. He teaches various courses relating to the history and production of motion picture films. He too found redeeming social value in the humor and satire of the film and felt that it did not affront contemporary community standards.[1]

---

1. Professor Brown found novelty in the method of production of the film. It was produced in a style called Feltboard animations. The court finds the novelty in production methods irrelevant to the issues.

Louis Sher testified that he intended showing the cartoon in combination with an X rated picture.[2] The claimant is the sole distributor of the film in the United States.

The test to determine obscenity as defined in Roth v. United States, 354 U.S. 476, 489, 77 S.Ct. 1304, 1311, 1 L.Ed.2d 1498 (1957), is "[W]hether to the average person, applying contemporary community standards, the dominant theme of the material taken as a whole appeals to prurient interest." Referring to the definition in *Roth* the Court stated in A. Book, etc. v. Attorney General of Com. of Mass., 383 U.S. 413, 418, 86 S.Ct. 975, 977, 16 L.Ed.2d 1 (1966):

"Under this definition, as elaborated in subsequent cases, three elements must coalesce: it must be established that (a) the dominant theme of the material taken as a whole appeals to a prurient interest in sex; (b) the material is patently offensive because it affronts contemporary community standards relating to the description or representation of sexual matters; and (c) the material is utterly without redeeming social value."

The difficulty in applying the test laid down by the Court is demonstrated in United States v. One Carton Positive Motion Picture Film, 367 F.2d 889 (2d Cir. 1966).[3] Circuit Judge Moore, writing for the court, quoted with approval a statement from a Swedish psychiatrist as follows:

"A society which is unable to endure '491' is a sick society; a society which is prepared to learn from it will become a sounder one." (p. 891).

Chief Judge Lumbard in dissent wrote:

"The strongest evidence in support of its obscenity is the picture itself.

Judge Waterman, Judge Moore and I had the distasteful experience of watching this film through its run of 110 minutes. No one would recognize the picture from Judge Moore's opinion as he omits any synopsis of what the cameras show." (p. 905).

Circuit Judge Waterman, concurring, found with real regret that "the film cannot truthfully be said to be utterly without redeeming social importance." He stated:

"Though the theme of the film is patently offensive to me and some of the shots would surely be beyond the limits of permissible candor if standards today were the standards of the less sophisticated era and area into which I was born and wherein I was reared, I agree that it cannot now be said that the standards of taste we would like are the standards of taste under which we now live." (p. 905).

■■ The burden of proving obscenity is on the government. Though forfeiture is penal in character, the burden of proof is that of a civil proceeding, i. e. a preponderance of the evidence. Compton v. United States, 377 F.2d 408 (8th Cir. 1967); D'Agostino v. United States, 261 F.2d 154 (9th Cir. 1958), cert. denied, 359 U.S. 953, 79 S.Ct. 739, 3 L.Ed.2d 760. It is not essential to every case (as contended by claimant) that expert testimony support the government's claim. United States v. Manarite, 448 F.2d 583, 593 (2d Cir. 1971), cert. denied sub nom. Portela v. United States, 404 U.S. 947, 92 S.Ct. 281, 30 L.Ed.2d 264. United States v. Klaw, 350 F.2d 155, 168 (2d Cir. 1965), did no more than indicate that in some cases where the jury had "absolutely no evidentiary basis from which to 'recognize' any appeal to

2. An exhibitor, under the rules promulgated in the industry need not apply for a rating if he rates the motion picture "X." The X rating permits only adults to view the film.

3. The film entitled "491" is a story of 6 youthful delinquents who are placed in a private home instead of a penal institution as a sociological experiment. Instead of punish-

ment they are offered kindness, forgiveness and understanding. The youths reject the outstretched hand and turn to violence and sadism. They steal and sell the possessions of their preceptor, they maim themselves and cause one to commit suicide. The film depicts sodomy, sexual intercourse with a prostitute, a homosexual act, and intercourse between the prostitute and a dog.

the prurient interest of the deviate or the typical recipient," expert testimony was essential. United States v. One Carton Positive Motion Picture Film, 367 F.2d 889, 893(2d Cir. 1966), stated that "[m]indful of the admonition that we are judges and not literary experts or philosophers, we turn to the witnesses for guidance in our own ultimate judgment." It requires, however, no particular expertise to uncover the appeal of "Sinderella." There is enough apparent in the film itself from which its appeal to prurient interest is evident.

The claimant in its trial brief cites two films held by the Second Circuit Court of Appeals to come within the constitutionally protected area, i. e. United States v. A Motion Picture Film Entitled "I Am Curious Yellow", 404 F.2d 196 (2d Cir. 1968), and United States v. 35 MM Motion Picture Film Entitled "Language of Love", 432 F.2d 705 (2d Cir. 1970). It is clear from Chief Judge Lumbard's dissenting opinion and Judge Friendly's concurring opinion that they found the film offended contemporary community standards. The film was found not obscene because Judge Friendly held that the film was not wholly without redeeming social value. Judge Moore wrote for a unanimous court in *Language of Love* in which he found that the film did not as a whole appeal to prurient interests. In comparing the film to "I Am Curious Yellow" he declined ". . . to tally the instances and methods of sexual accomplishment and compare score sheets in dealing with these films."

The sole interest of the film at bar is in the display of genitals and sexual activity. The entire 6½ minutes of the film displays such activity. The "plot" and "characters" are merely vehicles for carrying the subject to the screen, "depicting [acts of sexual intercourse] . . . in an exaggerated fashion." Ginzburg v. United States, 383 U.S. 463, 499 n. 3, 86 S.Ct. 942, 957, 16 L.Ed.2d 31 (Stewart, J., dissenting). Mr. Justice Stewart indicates that animated cartoons should not be treated differently than other types of film.

Though it is difficult to make such a subjective determination, United States v. 35 MM Motion Picture Film Entitled Language of Love, 432 F. 2d at 712, I find that the film was produced with a view to the commercial exploitation of its prurient appeal. Memoirs v. Massachusetts, 383 U.S. 413, 420, 86 S.Ct. 975, 978, 16 L.Ed.2d 1. The court is not bound by testimony of experts. To the contrary, Chief Judge Lumbard, dissenting in United States v. One Carton Positive Motion Picture Film, 367 F.2d at p. 906, said:

"Nor do the opinions of the experts whose business it is to find 'sermons in stones and good in everything,' Shakespeare, 'As You Like It,' 2:1:17 (Cam. ed. 1959), count for much on this point."

Mr. Sher testified that only adults would be permitted to view the film under the self-imposed X-rating. Though such a limitation on the class would satisfy the additional conditions found in Redrup v. New York, 386 U.S. 767, 769, 87 S.Ct. 1414, 1415, 18 L.Ed.2d 515 (1967), i. e. concern for minors and unwilling viewers, it does not satisfy the second element of the *Roth* test. Claimant argues that the relevant community standards are established with reference to the public who view X-rated movies. This concept is discussed by analogy in Mishkin v. State of New York, 383 U.S. 502, 508–509, 86 S.Ct. 958, 963–964, 16 L.Ed.2d 56 (1966). In *Mishkin* the intended recipients were various deviant sexual groups. The Court said:

"Where the material is designed for and primarily disseminated to a clearly defined deviant sexual group, rather than the public at large, the prurient-appeal requirement of the *Roth* test is satisfied if the dominant theme of the material taken as a whole appeals to the prurient interest in sex of the members of that group. * * * We adjust the prurient-appeal re-

quirement to social realities by permitting the appeal of this type of material to be assessed in terms of the sexual interests of its intended and probable recipient group. * * *"

See also United States v. 56 Cartons Containing 19,500 Copies of Mag. ("The Hellenic Sun"), 373 F.2d 635, 640–41 (4th Cir. 1967), citing *Mishkin*.[4]

*Mishkin* does not teach us that when sex-oriented materials are intended to appeal to a group other than the general community the prong of the *Roth* test relating to prurient interest is not used, but rather that the prong relates to the interest of the particular group. It may be that material will have an entirely different appeal to members of a particular group as opposed to the general community. What may rouse the prurient interest of one may merely sicken and disgust another. What may be tolerable or inoffensive to the general community may affront the sensibilities of members of a particular group.

While we do not imply that those who view X-rated movies are sexual deviates, we understand *Mishkin* to direct our attention to the particular group to which the cartoon is addressed, not to ascertain whether they find it offensive or inoffensive, but rather to ascertain whether it appeals to their prurient interests. The dominant theme of this film taken as a whole does indeed appeal to the prurient interest in sex of the theatre-going public which views X-rated pictures.

 The question remains as to whether the film is utterly without redeeming social value. Exhibitions of genitals or normal or abnormal sexual acts are not obscene if the material advocates ideas or is of some literary or scientific artistic value. Memoirs v. Massachusetts (Fanny Hill), 383 U.S. at 419, 86 S.Ct. at 978. Here the claimant urges that the cartoon's wit, humor and satire save it from condemnation. Humor in material otherwise obscene has

social value. The humor of "Sinderella" is said to lie in the incongruity between the sound track and the action on the screen and in the injection of identifiable parts of other fairy tales into the story of Sinderella. (tr. p. 107). In attempting to gauge the reaction of the viewing public to the purported "humor" in the cartoon, I believe few if any could find humor or wit in it. Incongruity alone, devoid of underlying intellectual or ideological content, is a mere gimmick. It does not infuse this cartoon with enough social value to retrieve it from the trash can.

Judgment is granted in favor of plaintiff forfeiting and condemning the film entitled "Sinderella" as provided in section 305 of the Tariff Act.

This memorandum of decision constitutes findings of fact and conclusions of law required by Rule 52 of the Federal Rules of Civil Procedure.

The Clerk is directed to enter judgment forfeiting the film entitled "Sinderella" as provided in section 305 of the Tariff Act.

4. Reversal sub nom. Potomac News Co., etc. v. United States, 389 U.S. 47, 88 S.Ct. 233, 19 L.Ed.2d 46 (1967).